Evans, *Administrator*, *Appellant*, v. Graden.

Division One, November 26, 1894.

1. **Principal and Surety:** LIABILITY OF SURETY: BUILDING CONTRACT. The liability of a surety is not to be extended beyond the terms of his contract, and he is entitled to the benefit of the securities taken by the creditor from the principal debtor. These principles are applicable to sureties on bonds given by contractors to secure the performance of their contracts for the erection of buildings.

2. ———: ———: ———: OVERPAYMENTS. Sureties on a building contractor's bond will be released by payments by the owner of the building to the contractor in excess of the percentage provided by the contract to be paid during the progress of its erection, where such excess is paid without the consent of the sureties.

3. **Practice:** INSTRUCTIONS. The giving of an instruction when there is no evidence upon which to base it constitutes reversible error.

4. **Principal and Surety:** LIABILITY OF SURETY: BUILDING CONTRACT, CHANGE IN. Changes made in a building contract after it is executed will discharge the surety on the contractors bond, unless the surety gave his consent to the changes.

5. **Building Contract:** SPECIFICATIONS: CONSTRUCTION: PRACTICE. Specifications in writing for the erection of a building constitute a part of the written contract and it is the duty of the court and not the jury to construe written contracts.

*Appeal from Platte Circuit Court.*—HON. WILLIAM S. HERNDON, Judge.

REVERSED AND REMANDED.

*George A. Lawrence* and *Jas. W. Coburn* for appellant.

(1) Before the surety can be released because of a change of a contract there must have been some change so as to alter its identity. *Warden v. Ryan*, 37 Mo. App. 466. (2) In *Leavel v. Porter*, 52 Mo. App. 642, the contract provided for departures which, however, were to be made by the owner stating them in writing with the certificate of the architect indorsed thereon. This was not done and the court held that the surety was not released. In the same case it was held that doing extra work, or work not done in the manner provided in the contract, not delaying the work embraced in the contract nor increasing the difficulty or expense of the structure, would not release the sureties. (3) In *Ryan v. Morton*, 65 Texas, 258, cited in *Warden v. Ryan*, 37 Mo. App. 467, approvingly, the contractor and owner agreed upon the addition of two galleries at a price not included in the original contract, and it was held not to affect the sureties. (4) Where a person becomes surety for the per-

formance of a building contract, and afterwards, without his knowledge, the builder consents to certain changes in the minor details of the work, but without binding himself to conform to such changes, and without agreement as to the modification of the original contract, the changes are not such as to discharge the surety. *Henricus v. Englert,* 17 N. Y. S. 235; *Dorsey v. McGee,* 46 N. W. Rep. 1018; *Moore v. Fountain,* 8 S. Rep. 509. (5) The uncontradicted evidence of Byers was that three fourths of the work had been done before the payment of the $2,000, the last money paid to Rider & Son and that it was paid with the consent of Graden and the other sureties. All the payments did not aggregate seventy per cent. of the work done and materials furnished. (6) After the abandonment of the work by Rider & Son, Graden, the defendant, took charge of the uncompleted building and sold lumber and with the proceeds paid the workmen. His letters to Park show that he waived any defense he might have had on account of any overpayment to Rider & Son and also of any changes made in the work or contract. (7) The bond and contract were both on the same paper. *Leaven v. Porter,* 52 Mo. 643.

*George W. Day* and *A. D. Burnes* for respondent.

"Nothing can be clearer, both upon principle and authority than the doctrine that the liability of a surety is not to be extended, by implication, beyond the terms of his contract. To the extent and in the manner and under the circumstances pointed out in his obligation, he is bound, and no further. It is not sufficient that he may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his con-

tract; and if he does not assent to any variation of it, and a variation is made, it is fatal." Per STORY, judge, in *Miller v. Stewart*, 9 Wheat. 680; *Blair v. Ins. Co.*, 10 Mo. 560; *Nolley v. County Court*, 11 Mo. 447; *St. Louis v. Sickles*, 52 Mo. 122; *State to use v. Boon*, 44 Mo. 254; *Prior v. Kiso*, 81 Mo. 241; *Beers v. Wolf*, 116 Mo. 179. Even though the change in the contract may be beneficial to the surety, yet he is discharged. "*Non hæc in fœdera veni* is an answer in the mouth of the surety from which the obligee can never extricate his case, however innocently or by whatever kind intentions to all parties, he may have been actuated." *Bethune v. Dozier*, 10 Ga. 235; *Rowan v. Mfg. Co.*, 33 Conn. 1; *Warden v. Ryan*, 37 Mo. App. 466; *Mackay v. Dodge*, 5 Ala. 388; *Simonson v. Grant*, 36 Minn. 439. The time and manner of payment, as fixed by contract, for the performance of which one becomes bound as surety, are for the benefit of the surety, as well as the principals; and a departure from the mode prescribed by the contract, without the consent of the surety, releases him, for he is thereby deprived of the inducement which his principal would have to perform the contract. *Taylor v. Jeter*, 23 Mo. 244; *Bragg v. Shain*, 49 Cal. 131; *Ryan v. Morton*, 65 Texas, 258; *Calvert v. Dock Co.*, 2 Keen, 638; *Navigation Co. v. Rolt*, 6 J. Scott (N. S.), 550, reported 95 Eng. Com. Law Repts. 549. He who relies upon a waiver must show that it was made with knowledge of all the material facts. *Dyas v. Hanson*, 14 Mo. App. 364. When a waiver is relied upon it must be pleaded. *Ferneau v. Whitford*, 39 Mo. App. 311; *Ehrlich v. Ins. Co.*, 103 Mo. 231; *Lanitz v. King*, 93 Mo. 513; *Bank v. Hatch*, 78 Mo. 13; *Nichols v. Larkin*, 79 Mo. 264. An appellate court will not invade the province of the jury, nor interfere where there is any evidence to support the verdict. *Reynolds v. Rogers*, 63 Mo. 17;

*Tuggle v. Railroad*, 62 Mo. 425; *Kitchen v. Railroad*, 59 Mo. 514; *Wilson v. Maxwell*, 57 Mo. 146; *Peacock v. Nelson*, 50 Mo. 256; *McCartney v. Ins. Co.*, 45 Mo. App. 373; *Turner v. Gibbs*, 50 Mo. 556.

BLACK, P. J.—On the twenty-second day of May, 1889, Col. George S. Park and James Rider & Son entered into a written contract whereby Rider & Son agreed to furnish all the material and erect for Park a· building at Parkville in this state, for the use of Park College. The contract provides that the building shall be a frame structure, and shall be erected according to specifications prepared by Mr. Hogg and certain other specifications prepared by Mr. Park. Park agreed to pay Rider & Son $5,800, Rider & Son "not drawing at any time over seventy per cent. of the work done, the whole work to be completed" by October 1, 1889. On the same day Rider & Son gave bond to secure the performance of the contract, with the defendant Graden and others as sureties. Rider & Son abandoned the work on September 1, 1889, so that Park was obliged to complete the building himself. The amount paid by him to Rider & Son and for completing the building, exceeds the contract price some $1,408. Park died, and the plaintiff, as his administrator, brought this suit against the defendant surety on the bond to recover the last named sum. He claims other damages for other alleged breaches of the contract, but no question is made in this court over the other alleged breaches.

The defendant, by his answer, admits the execution of the contract and bond, and then follows a general denial. For a further defense he sets up the same contract pleaded by the plaintiff, and states facts to the effect that Park, from time to time, paid Rider & Son more than seventy per cent. of the value of the work done. For a further affirmative defense, he says Park

and Rider & Son, without his consent, changed the contract as set forth in the specifications in these several particulars, namely: *First*, so that the front doorway was cut down and lowered three feet; *second*, so that the building was to be heated by a hot air furnace instead of stoves; and *third*, from a tar and gravel roof to a tin roof.

At the close of the evidence the court gave four instructions at the request of the plaintiff, ten at the request of the defendant, and of its own motion contributed nineteen more, in all covering some twenty pages of printed matter. Thus enlightened as to the law, the jury found for the defendant.

1. The liability of a surety is not to be extended beyond the terms of his contract. He is bound to the extent of his contract, but no further. He is also entitled to the benefit of the securities taken by the creditor from the principal debtor. These principles of law are applicable to sureties on these bonds given by contractors to secure the performance of their contracts for the erection of buildings. The defendant, as a surety, has a right to stand upon the agreement that Park would not pay Rider & Son during the progress of the work more than seventy per cent. of the value of the work done; and if Park, during the progress of the work, paid Rider & Son more than seventy per cent. of the value of the work done, without the consent of the sureties, he thereby discharged the defendant. *Taylor v. Jeter*, 23 Mo. 244; *Ryan v. Morton*, 65 Texas, 258; *Bragg v. Shain*, 49 Cal. 131. If the defendant surety consented to the overpayments, if any there were, then he is not discharged. These principles of law are set forth in the instructions given, and we see no objection to them so far as they relate to this branch of the case.

Mr. Byers, agent for Park and a witness for the plaintiff, testified on direct and on cross-examination to the

following effect:    That he paid Rider & Son $500 at a time until he paid them $1,500, when some misunderstanding arose and he refused to pay more; that James Rider, the defendant Graden, and another surety by the name of Paul came to see him, and upon their assurance that Rider & Son were going on with the work, he paid Rider another $500; that he paid on vouchers for material some $1,200 in addition thereto. We understand these payments were all made prior to September 1, 1889, the date at which Rider & Son abandoned the work.    This witness says the framework, roof, and a large part of the plastering had been completed at that time, and he thinks the entire work was about three fourths performed. There was some other evidence having a little bearing on the same subject. We think this evidence made a case for the jury on the question whether Park made overpayments, and the question whether defendant gave his consent thereto.

2.    Some of the instructions informed the jury that if there was an agreement between Park and Rider & Son, made after the execution of the bond, whereby the main doorway was to be, and was, cut down, and this agreement was contrary to the specifications, then the finding should be for the defendant.    This instruction should not have been given for this reason, among others: There was no evidence, whatever, tending to show any change in the main entrance of the doorway. The giving of this instruction is reversible error.

3.    By another instruction the court made it the duty of the jury, in passing upon an alleged change in the terms of the contract, to first "determine what the contract and specifications required as to the construction."    The ninth and more specific instruction is to this effect: If the jury find from the evidence that the contract and specifications agreed upon for the construction of the building provided for heating by

stoves, or provided for a tar and gravel roof; that after the bond was executed Park and Rider & Son made an agreement whereby the work was changed so that the building could be heated by a furnace by putting in hot air pipes, or the roof was changed from tar and gravel to tin, all without the consent of defendant, then the jury should find for defendant.

If changes were made in the contract after it was executed, in either of the respects mentioned in this instruction, without the consent of the defendant, then the defendant ceased to be bound as a surety on the bond. Such changes would discharge the surety, unless he gave his consent thereto. *Beers v. Wolf*, 116 Mo. 179. But there are several objections to these instructions. In the first place the court should have told the jury what the terms of the contract were in these respects, instead of leaving it to the jury to say whether the specifications called for hot air flues, or for a gravel roof. The specifications are in writing, and they constitute a part and parcel of the contract. It is useless to cite authorities to show that it is the duty of the court, and not of the jury, to construe written contracts.

In the next place, on turning to the specifications prepared by Mr. Hogg, we find that the roof was to be a mansard roof, the "rake" of the sides to be covered with shingles, and the deck with I. C. tin. There is not a thing in the specifications prepared by Mr. Park to modify or change this call for a tin roof. The specifications prepared by Park and made a part of the contract, contain this as the last clause: "A door may be made at the foundation at the proper place for heating the building, and the tin piping through the house at necessary places, to be in readiness for the hot air furnace." It is, therefore, plain that the contract for the performance of which the defendant

became a surety, called for a tin roof and for hot air flues. The issues made by the pleadings in respect to the alleged change in the roof and flues should have been instructed out of the case instead of being submitted to the jury.

But it is said they were properly submitted to the jury because there was evidence tending to show that the specifications had been altered by erasures and interlineations, after the execution of the contract, so as to make them call for a gravel roof and hot air pipes. The evidence bearing upon this subject is to the following effect: Mr. Park was a man advanced in years. He resided in the state of Illinois. He concluded to build an addition to Park College at his own expense, and procured Mr. Hogg, an architect, to prepare plans and specifications for a brick structure, but to reduce the expense concluded to use wood instead of brick. He did not have new specifications prepared, but prepared some himself, making a few changes only, generally such as became necessary by the change from brick to wood. The specifications prepared by him and those prepared by the architect are mentioned in the contract. On May 13, 1889, he and Mr. Byers examined the specifications prepared by himself, and concluded they were too indefinite in several respects. Several alterations and interlineations were made by Byers and Mr. Park at that time. Byers then took all of the specifications from Parkville to Kansas City, and there went over them with Rider, one of the contractors. Byers was to consult Rider in regard to hot air flues. During the consultation, the last clause of the specifications was changed so as to read as before set out. Rider took the specifications as thus changed for the purpose of making a copy, and at a subsequent date executed the contract at Parkville. Byers says the interlineations and erasures were all

made before the execution of the contract. After the contract had been signed, Rider handed the specifications to Mr. Kahm at Parkville. The evidence is all to the effect that no alterations were made after the specifications were thus handed to Mr. Kahm.

The further testimony of Mr. Byers is that he was the agent of Mr. Park for the purpose of paying out money, and he went to Parkville about once a month to see the building as work progressed. Kahm looked after the same matters for Park at Parkville. Mr. Byers states in his cross-examination that Rider & Son were to have $60 extra for putting on a tin roof, but he says he does not know whether this agreement was made before or after the execution of the written contract. He says Rider was to have $75 for putting in hot air flues, but it is evident that in making this statement he speaks of his negotiations with Rider before the execution of the contract.

The defendant places some stress on the following letter from Park to Rider, dated in July, 1889:

"I am glad that you are progressing finely with the house. I am thinking perhaps we had better put up the furnace either by steam or heat when we are about it. What will be the price, either by heat or steam, put up complete and leveled down? Please write to me. I will write Mr. Byers about it in a day or two. It will save stoves, etc."

Now the call for a tin roof is found in the specifications prepared by the architect and nowhere else, and these specifications were never changed by erasures or interlineations. The specifications prepared by Mr. Park do not now, and never did, mention the material of which the roof was to be made. There is no evidence showing, or even tending to show, any change of the specifications on this subject. The evidence is all to the effect that the changes made in the specifica-

tions, so far as they relate to hot air flues, were made by Byers, at Kansas City, before the execution of the contract and bond, and that they were made pursuant to an agreement then made by Byers and Rider. We fail to see anything in the letter from Park to Rider, showing or even tending to show such alleged alteration. It is to be remembered, the specifications did not require Rider to put in a hot air or any other furnace. It was simply his contract to put in place hot air tin pipes. In the letter, Park asks for the cost of a hot air or steam furnace. There is nothing in this inquiry inconsistent with the proposition that Rider had agreed to put in place hot air flues. A finding by a jury, on this evidence, that the specifications prepared by Park were changed and altered by erasures and interlineations after the execution of the contract sued upon, so as to call for hot air flues, ought to be set aside for want of evidence to support it, and this being so, the issue should not have been submitted to the jury. Our conclusion before stated in respect of the instruction now under consideration stands unshaken.

The judgment is reversed and the cause remanded for a new trial. All concur.